**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **ALEXIS RIX,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 22-00406-KD-N** |
| ) | |
| **NORTHCUTT DENTAL MANAGEMENT** ) | |
| **SERVICES, INC., d/b/a NORTHCUTT** ) | |
| **DENTAL,** ) | |
| ) | |
| **Defendant.** ) | |

**<u>ORDER</u>**

This action is now before the Court on the motion to compel arbitration and stay court proceedings and supporting documents filed by Defendant Northcutt Dental Management Services, Inc., d/b/a Northcutt Dental, the Response filed by Plaintiff Alexis Rix and supporting documents, and Northcutt's reply and supporting documents (docs. 19, 20, 23, 24, 25). Upon consideration and for the reasons set forth herein, the motion is GRANTED. Accordingly, this action is STAYED.   The parties shall, on or before **November 7, 2023**, file a **joint report** to advise the Court as to the status of the arbitration.

I. <u>Background</u>

A. <u>Rix's Complaint</u>

According to the complaint, Rix was hired as a dental hygiene assistant at Northcutt's Cottage Hill location in Mobile, Alabama on May 4, 2015 (doc. 1). Northcutt "is a family-owned dental practice with four locations in the Mobile area." (doc. 20-1, p 1). At that time, Rix told Northcutt she had "Attention Deficit Hyperactivity Disorder and severe anxiety disorder" (Id.).

Rix alleges that in August 2019, Northcutt was made aware that she was pregnant and would no longer take the prescribed medications for her anxiety and ADHD (doc. 1). On Feb. 18,

2020, Rix informed Northcutt that she "was experiencing physical discomfort." (Id.). According to Rix, Northcutt "responded by ordering Ms. Rix to continue working her assigned duties." (Id.). Later that day, Rix's physician placed her on "modified bedrest extending six to eight weeks beyond her expected delivery date" (Id.).

Rix returned to work, two and one-half months later, on April 30, 2020 (Id.). She alleges that after her return, Northcutt "began to retaliate against her because of her leave and request for accommodation under" the FMLA (Id.). Primarily, she complains that Northcutt would not accommodate her needs as a nursing mother and in May 2020, forced her to admit to an infraction she did not commit. Rix alleges that because of the alleged retaliation, her underlying conditions exacerbated. (Id.).

Rix alleges that nine months later, on February 2, 2021, she was "verbally attacked" by a manager and became physically ill (Id.). On February 3, 2021, she requested leave under the FMLA. Rix alleges that after this request, she was "hissed at" by a manager who made other unpleasant remarks to Rix about her employment. Rix, who is African American, also alleges she was demoted from Shift Leader, and replaced by a white woman with less experience and lower qualifications. (Id.)

The complaint is unclear as to whether Rix took FMLA leave in February 2021. Other documents indicate that she did (doc. 24-1; doc. 24-2). Ultimately, Rix voluntarily resigned on May 6, 2021.[1]

---

[1] Rix texted Human Resources: "Also are you able to send me a copy of the meeting notes from 2/3/2021; also documentation of Dr. Northcutt staying the demotion of me practicing hygiene (without any affect on my pay) and forgiving my loan if I leave on good terms!" (doc. 24-1).

On June 21, 2021, Rix filed a Charge of Discrimination with the Equal Employment Opportunity Commission. She alleged race discrimination, retaliation (FMLA) and disability discrimination (doc. 24-5, p. 1).[2] The EEOC issued a Notice of Rights to Sue on July 19, 2022.

B. Procedural history

On October 17, 2022, Rix filed her complaint against Northcutt pursuant to Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000(e) et seq.) and 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991; the Pregnancy Discrimination Act of 1978 and the Family Medical Leave Act (FMLA) of 1993. She alleges that Northcutt discriminated against her based upon race (Counts I - II), pregnancy (Count V), and request pursuant to the FMLA (Count VII). Rix also alleges unlawfully retaliation for participating in protected activities (Counts III – IV, VI, and VIII) (doc. 1). Northcutt was served December 3, 2022 and answered the complaint on December 20, 2022 (doc. 4).

The parties participated in the planning meeting, and on February 2, 2023, filed their report (doc. 14). On February 11, 2023, Northcutt, through counsel, notified Rix's counsel that her claims were subject to arbitration through the ADRP and provided a copy. Northcutt asked that Rix consent to a stay for arbitration. Rix's counsel requested time to review the ADRP (doc. 20-2, Declaration of Northcutt's counsel). At the February 15, 2023 scheduling conference, Northcutt's counsel notified the Court that it planned to file the instant motion to compel arbitration and Rix's counsel advised the Court that Rix disputed signing the ADRP (Id.). The Rule 16(b) Scheduling Order was entered (doc. 16). In mid-February 2023, Rix served Northcutt with discovery documents (doc. 18). On March 22, 2023, Northcutt filed the motion to compel

---

[2] Rix also filed a copy of the "Audit Trail" for her electronic signature (doc. 24-5, p. 3).

arbitration and to stay this action (doc. 19). Rix filed her response and Northcutt filed its reply (docs. 23, 25).

    C. <u>Northcutt's Core Policies, Alternative Dispute Resolution Policy, and Confidentiality and Nondisclosure Agreement</u>

    In March 2018, Northcutt implemented an Alternative Dispute Resolution Policy (ADRP), updated its Core Policies (also known as the employee handbook) to include the ADRP, and implemented a Confidentiality and Nondisclosure Agreement (doc. 20-1, Affidavit of Human Resources Director). Relevant to the pending motion, the ADRP contained mutually binding provisions for private mediation and/or arbitration administered by the American Arbitration Association. The ADRP was binding on new employees. Employees who continued employment with Northcutt for thirty days after receipt of the ADRP were "deemed to have accepted this policy as the sole and exclusive method for resolving covered workplace disputes and issues of legal rights." The ADRP states as follows:

BINDING POLICY

This Policy is mandatory and mutually binding on both the Employer and its Employees. Employer has adopted the Alternative Dispute Resolution Policy as a condition of any offer of employment for all new employees, as of the effective date of this document. All employees who continue employment with Employer thirty days after receipt of this policy will be deemed to have agreed to and accepted this policy as the sole and exclusive method for resolving covered workplace disputes and issues of legal rights.

MEDIATION AND ARBITRATION

This Alternative Dispute Resolution Policy requires that, as an alternative to resorting to litigation, aggrieved parties must attempt to resolve workplace disagreements by complying with prescribed internal procedures and, failing that, through use of private, independent mediation and/or arbitration administered by the American Arbitration Association (AAA).

(Doc. 20-1, p. 11). In relevant part, the claims covered by the ADRP include claims for

discrimination and retaliation based on race or gender and claims for alleged violations of federal

statutes. Specifically,

> Claims covered by this policy include, but are not limited to, claims related to
> termination of employment; claims for wages or other compensation due; claims
> for breach of any contract or covenant, express or implied; tort claims; claims of
> harassment; claims for discrimination, including, but not limited to,
> discrimination based on race, gender, sexual orientation, religion, national origin,
> age, marital status, genetic information, handicap, disability or mental condition;
> wage and hour violation claims; claims for retaliation; claims for alleged violation
> of federal, state or other government constitution, statute, ordinance or regulation;
> and claims for benefits, except as excluded in the following section.
>
> By way of example only, such claims include claims under federal, state and local
> statutory or common law, such as Age Discrimination in Employment Act, Title
> VII of the Civil Rights Act or 1964, as amended, including the amendments of the
> Civil Rights Act of 1991, the Americans with Disabilities Amendments Act of
> 2008, the law of contract and the law of tort. Disputes arising out of a collective
> bargaining agreement between a union and an employer are only covered where
> the CBA indicates an agreement to be subject to arbitration.

 (Doc. 20-1, p. 12).

The Core Policies, in paragraph 25, captioned "Employee Concern Reporting Policy"

which states as follows:

> Our Employee Concern Policy is designed with the intent of addressing
> employees' concerns within the workplace. This policy is designed to provide you
> a way to report a specific or general concern about the Practice, a co-worker,
> management, or anyone else associated with the operations of our business,
> including customers/patients or service providers.
>
> We cannot address or fix a problem that we have not been informed about.
> Therefore, it is your responsibility to report your concerns to us and to allow us an
> opportunity to address them. Finally, we want you to know that we have an open-
> door policy and you should feel comfortable reporting your concerns to us. Please
> note that the Practice has also implemented the Alternative Dispute Resolution
> Policy (ADRP). The two policies are not mutually exclusive, but rather are meant
> to cover all disputes, both small and large. If your concern falls within the defined

claims in the ADRP, or if there is a conflict between the two policies, the ADRP
will control and the procedures therein should be followed.

(Doc. 20-1, p. 79).

D. Northcutt's method for sending and sharing documents with employees.

Northcutt uses an online human resources service, CEDR Solutions online HR Solutions

Center, to electronically send and share documents, such as the Core Policies, which references

the ADRP, and the ADRP, with its employees (doc. 20-1, p. 4). This service allows employees to

review and electronically sign documents through a "secure, password protected portal called

HR Vault" (Id.) A secure web-link is sent to the employees' personal email address to notify

employees of "uploaded files that require their attention and signature" (Id.).

The employees access the uploaded documents by logging in with their username and

password. For Northcutt, the employees' personal email address is their username, but the

employees create their own passwords. (Id.) Northcutt states that because the "emails are sent to

the employees' personal email accounts, no one at Northcutt Dental has access to the employees'

individual HR Vault portal or log in credentials" and cannot reset their passwords. (Id., p. 4-5).

Northcutt explains the process as follows:

10. Once the employee accesses their HR Vault portal, they can view their
Employee File Folder under "My Files." If there are documents that require the
employee's attention and signature, those documents are under a red "To Sign"
tab. The document can also be accessed under the yellow "New" tab if it is the
employee's first time accessing the portal since the new documents were
uploaded.

11. The employee is then prompted to sign requested documents. To
electronically sign the document, the employee must select the desired document
which opens a separate tab with the document viewable as a PDF. There is a red
bar in the top left corner stating, "After review, please scroll to the bottom of the
document or click this red box to sign." The employee then receives the following

6

message that is also in a red bar: "After reviewing the document in its entirety, you may sign it by entering your initials in the box and clicking the 'Sign Now' button below."

12. After the employee enters their initials and clicks the blue "Sign Now" button, the button turns green, and an acknowledgment prompt appears before the employee can proceed further. The acknowledgment states: "By selecting OK, I agree that my initials will be the electronic representation of my signature on this document – just the same as a pen-and-paper signature or initial." The employee can select "OK" or "Cancel." If the employee affirmatively agrees, they are rerouted back to the HR Vault portal, and the document has a green thumbs up icon with a "Signed" message and their initials, noting the time, date, and IP address that the employee electronically signed the document.

(Doc. 20-1, p. 5-6).

E. Northcutt's sharing of the updated Core Policies, ADRP, and Confidentiality and Nondisclosure Agreement

On April 2, 2018, Northcutt shared the updated Core Policies, ADRP, and Confidentiality and Nondisclosure Agreement with all its employees. (Doc. 20-1, p. 6) (updated March 2018, see Section D). The CEDR Solutions online HR Solutions Center allows the Human Resources Director to determine whether an employee has completed a document or when a document is outstanding, and may notify the employee (Id., p. 6, 8). On the morning of May 21, 2018, before the "morning meeting", Northcutt's Human Resources Director's assistant notified all office managers, including Cottage Hill's, as to employees who had not reviewed and signed the Core Policies, the ADRP and the Confidentiality and Nondisclosure Agreement (Id., p. 6).

F. Rix's documents

Rix was among the employees who had not reviewed and signed the documents (doc. 20-1, p. 6). Northcutt alleges that around 11:00 a.m., that same day, Rix accessed the HR Vault portal and electronically signed the documents. (Id., p. 7). Northcutt alleges that Rix "electronically signed and affixed her initials, 'AR,' to each document, using her personal email

7

address (alexisrix62@gmail.com) as her username and using IP address 170.249.169.238" and that this "IP address is associated with internet server located at the Cottage Hill office of Northcutt Dental." (Id.). "Signature Receipts" were returned by email to Northcutt (Id., p. 18, ADRP receipt; p. 82, Core Policies receipt; p. 89, Confidentiality and Nondisclosure Agreement receipt). Rix's time records indicate that she was at work at the time she allegedly signed the documents (Id, p. 91, "Time Punch Report"). Rix had previously used this same email address and same signing procedure for other employment documents (Id., p. 6).[3]

Rix disputes that she "signed, agreed to, was aware of, received, and/or reviewed any document titled 'Alternative Dispute Resolution Policy, or any document purporting to bind me to arbitration or alternative dispute resolution" (doc. 24-6, Rix Declaration, p. 3). Rix states she has never seen, signed, or reviewed the ADRP or the arbitration clause (doc. 23, p. 2-3; doc. 24-6, p. 1-2). She states that she "did not click on anything on any electronic device agreeing to resolve any of [her] claims against Northcutt Dental" and "never had access to the 'HR Vault Portal'" (doc. 24-6, p. 2).

In support of her position that she "never had access to the 'HR Vault Portal'", Rix provides a February 8-9, 2021 text message exchange[4] between Rix and Northcutt's Human

---

[3] The director stated that Rix used this same email address for her "new hire paperwork, including her resume, direct deposit form, I-9, employment application, and other documents including the EEOC charge" (doc. 20-1, p. 6). Rix declares that "Upon being hired, I completed by hand forms for federal tax withholding, federal employment eligibility verification, salary direct deposit, monthly health coverage contribution elections, and other new-hire documents and hand-signed all of them." (doc. 24-6). Rix was hired in 2015. That she hand-signed these documents has no bearing on whether she electronically signed the ADRP in 2021.

[4] Rix provides a copy of a text message exchange. In her affidavit, Rix quotes the Human Resources Director's statement that the Core Policies, which include the ADRP, "is on your Vault that you have access to. If you cannot find it, I will send it with everything else as soon as I am able" (doc. 24-1, p. 3). Rix responds: "Okay I don't have access send it as well thank you"

Resources Director, and a February 9, 2021 screen shot from Google Mail,[5] which allegedly "demonstrate[] that [the director] ultimately emailed [Rix] certain documents" for signature because Rix "did not have access to the 'HR Vault Portal'" (Id., p. 3).

II. Waiver of right to enforce an arbitration agreement

Rix argues that Northcutt is in default and has waived its right to "enforce the alleged arbitration agreement" (doc. 23, p. 8-11) (citing Section 3 of the FAA, for the premise that the court should stay the proceedings "providing the applicant for the stay is not in default in proceeding with such arbitration" (Id., p. 9). As grounds, Rix argues that Northcutt waived its right because it did not "timely file a responsive pleading compelling arbitration" (Id., p. 8).   As to timeliness, Rix, assuming only for purposes of this argument that the ADRP is a valid contract, argues that Northcutt did not file its motion to compel arbitration within 180 days from the date of their dispute, as provided in the ADRP.   Rix explains that she filed her EEOC complaint in June 2021, but Northcutt did not allege the existence of the ADRP until February 2023, and then filed its motion to compel a month later, all beyond the 180-day period starting in June 2021.

Northcutt argues that the "180-day time limitation applies only" to Rix because "she is the aggrieved party seeking to resolve a dispute" (doc. 25, p. 2).

The ADRP contains the following:

TIME LIMITATIONS

---

(Id.) (*sic*). Afterward, the documents were emailed to Rix, as shown by the Google Mail screenshot.

[5] The screenshot indicates that Rix received copies of three PDF attachments "FMLA-Certification of H", "NYL.pdf", and "Core Policies Leave of A…" (doc. 24-2).

> Requests for outside resolution (mediation or arbitration) of workplace grievances must be submitted as described herein within 180 days of the date the dispute arose or the date on which the aggrieved party first became aware of the grievance, whichever is later, unless governed otherwise by applicable law. Notwithstanding the forgoing, the parties shall comply in all cases with statutes of limitations for workplace disputes in accordance with federal or state law, which may vary from state to state. The limitation period shall continue to run during any period when the ADRP is being used by an employee to resolve a workplace grievance with management. The limitation period shall also run concurrently with any administrative claim process filed with the EEOC, NLRB, or equivalent state department.

(Doc. 20-1, p. 12).[6]

> In support of her argument, Rix cited only a part of the first sentence. Specifically,

> Requests for outside resolution (mediation or arbitration) of workplace grievances must be submitted as described herein within 180 days of the date the dispute arose …

(Doc. 23, p. 9, Rix's reply).   However, an overall reading of the policy indicates that the time limitation applies to the aggrieved party, which in this circumstance, is Rix.   Specifically, the referenced paragraph states that "requests … must be submitted as described herein." (Doc. 20-1, p. 12). Then, under "Stage 3. Binding Arbitration", the policy states "the <u>aggrieved party</u> shall submit …" (Doc. 20-1, p. 15) (emphasis added). Therefore, this argument provides no basis for the Court to find that Northcutt defaulted or waived its right to request arbitration.

Rix also points out that Northcutt did not request arbitration until four months after the complaint was filed and then did not move to compel arbitration until a month later. Rix also points out that Northcutt did not raise arbitration during the EEOC proceedings and did not

---

[6]   "If after Stage 2 the dispute remains unresolved, or the parties skip Step 2, the next step is binding AAA arbitration. To initiate binding arbitration, the aggrieved party shall submit notice of its intention to arbitrate, along with a copy of this ADRP, using AAA's online filing system at www.adr.org." (Doc. 20-1, p. 15).

include it among the affirmative defenses in its answer (doc. 23, p. 8, 10-11). She argues that under the totality of these circumstances, Northcutt's actions were inconsistent with its right to arbitrate, and thus constitute a default and waiver of its right to arbitrate (doc. 23, p. 9-11).

Northcutt responds that it engaged in only limited initial litigation procedures – answering the complaint, participating in the parties' planning meeting and report, informing Rix of the request for arbitration, and attending a scheduling conference – before filing the motion to compel. Northcutt also points out that it has not engaged in discovery (doc. 25).   Northcutt also argues that the ADRP was not binding on the EEOC and thus, there was no reason to mention arbitration during those proceedings.   Northcutt also argues that arbitration is not a defense to Rix's claims, but instead arbitration addresses the forum for resolving those claims, not the merits, and thus need not have been included in the affirmative defenses.   Based thereon, Northcutt argues that it has not acted inconsistently with its right to arbitrate by its participation in the initial litigation procedures, but instead promptly asserted its rights, conferred with opposing counsel, and advised the courts; and therefore, has not intentionally relinquished or abandoned that right.

The Court finds that Northcutt's participation in this action has not been inconsistent with its right to arbitration, and that it has not waived that right. The Court of Appeals for the Eleventh Circuit explained that a "'party has waived its right to arbitrate if, under the totality of the circumstances, the party acted inconsistently with the arbitration right…'" <u>Warrington v. Rocky Patel Premium Cigars, Inc</u>., No. 22-12575, 2023 WL 1818920, at *2 (11th Cir. Feb. 8, 2023) (unreported opinion) (citation omitted).   And that a "'key factor in deciding this is whether a party has substantially invoked the litigation machinery prior to demanding arbitration'" because the "'purpose of the waiver doctrine is to prevent litigants from abusing the

judicial process.'" Id. Another factor to consider is fair notice to the opposing party. Gutierrez v. Wells Fargo Bank, NA, 889 F.3d 1230, 1236 (11th Cir. 2018) ("The key ingredient in the waiver analysis is fair notice to the opposing party and the District Court of a party's arbitration rights and its intent to exercise them.").

The action was in the early stages of litigation when the motion to compel was filed. Although the complaint was filed October 17, 2022, and summons issued October 18, 2022, Northcutt was not served until December 3, 2022. Northcutt filed its answer on December 20, 2022.  Although Northcutt did not include arbitration as an affirmative defense[7] in its answer, only two months passed before Northcutt emailed Rix to request arbitration (February 11, 2023) and advised counsel and the Magistrate Judge of its intent to pursue arbitration (February 15, 2023). And three months passed before Northcutt filed the motion to compel arbitration on March 22, 2023. The judicial process has not been abused and Northcutt did not "substantially invoke[] the litigation machinery" before notifying Rix of its intent to pursue arbitration under the ADRP and filing the motion to compel.[8]

---

[7]  The affirmative defenses listed in Fed. R. Civ. P. 8(c)(1) include "arbitration and award" not just arbitration. See AKZO Nobel Coatings Inc. v. Color & Equip. LLC, No. 2:11-CV-00082-RDP, 2012 WL 12960780, at *3 (N.D. Ala. July 16, 2012) ("As noted above, failure to raise arbitration as an affirmative defense does not constitute waiver, particularly when under Federal Rule of Civil Procedure 8(c)(1) it is 'arbitration and award,' rather than simply the invocation of the right to arbitrate, which is the affirmative defense.") (footnote omitted) (citation omitted) (emphasis added).

[8]  In 2022, the Supreme Court' decided Morgan v. Sundance, Inc., 142 S. Ct. 1708 (2022). Before that decision, a party waived a contractual right to arbitrate when "(1) the party seeking arbitration substantially participates in litigation ...; and (2) this participation results in prejudice to the opposing party." In re Checking Acct. Overdraft Litig., 754 F.3d 1290, 1294 (11th Cir. 2014). However, Morgan appears to have eliminated the prejudice prong of the analysis. Morgan, 142 S. Ct. at 1714 ("As explained above, the usual federal rule of waiver does not include a prejudice requirement. So Section 6 instructs that prejudice is not a condition of finding that a party, by litigating too long, waived its right to stay litigation or compel arbitration

Rix also argues that Northcutt waived its right "because it has never moved to compel arbitration under Section 4" of the FAA (doc. 23, p. 9-10). She cites Section 4, as follows:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

Rix appears to argue that Northcutt should have filed a separate petition in the district court as opposed to filing a motion to compel arbitration in this action.   Rix has not provided any legal authority for this argument.   To the contrary Section 3 of the FAA states as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.   Here, a suit is pending – Rix has sued Northcutt – and now Northcutt has applied to stay the trial pending arbitration.

III. Motion to compel arbitration.

Northcutt moves pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*., to compel arbitration and for stay pending arbitration (doc. 19, 20). The FAA provides that a "written provision" in a "contract evidencing a transaction involving commerce to settle by arbitration a

---

under the FAA.") (abrogating S & H Contractors, Inc. v. A. J. Taft Coal Co., 906 F.2d 1507, 1514 (11th Cir, 1990)).

controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.   Section 3 provides that district courts should stay their proceedings in any action raising a dispute on an issue referable to arbitration. 9 U.S.C. § 3. Section 4 of the FAA authorizes the district courts to issue an order directing that arbitration proceed if there has been a "failure, neglect, or refusal" to comply with an arbitration agreement. 9 U.S.C. § 4.

"The decision to compel arbitration under the FAA depends on consideration of three factors, [ ]: (1) whether the parties formed a valid and enforceable agreement to arbitrate; (2) whether the agreement to arbitrate encompasses the underlying dispute; and (3) whether the underlying contract evidences a transaction involving interstate commerce." Sample v. Dollar General, 2023 WL 2252404, *4 (S.D. Ala. Jan. 6, 2023) (Report and Recommendation adopted by 2023 WL 2244686 (S.D. Ala. Feb. 24, 2023) (citing 9 U.S.C. §§ 2-3 and King v. Cintas Corp., 920 F. Supp. 2d 1263, 1267 (N.D. Ala. 2013)).

A. Existence of an arbitration agreement.

"The threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract.' … Absent such an agreement, 'a court cannot compel the parties to settle their dispute in an arbitral forum.'" Bazemore v. Jefferson Capital Sys., LLC, 827 F.3d 1325, 1329 (11th Cir. 2016); In re Checking Account Overdraft Litig., 754 F.3d 1290, 1294 (11th Cir. 2014) (an order compelling arbitration is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate'"). The presumption[9]

---

[9] "Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" Hall St. Assocs., LLC v. Mattel, Inc., 552 U.S. 576, 581 (2008) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006) (alterations in original)). In view of

in favor of arbitration, "does not apply to disputes concerning whether an agreement to arbitrate has been made."" Bazemore, 827 F.3d at 1329.

Thus, the Court looks to whether the ADRP is a valid contract. Burch v. P.J. Cheese, Inc., 861 F. 3d 1338, 1346 (11th Cir. 2017) ("When, as in this case, a party moves a district court to compel arbitration under the FAA, the court must first determine whether 'the making of the agreement for arbitration or the failure to comply therewith is ... in issue."") (quoting 9 U.S.C. § 4). "[J]ust as state law generally governs whether an enforceable contract exists,' state law generally governs whether an enforceable 'agreement to arbitrate exists' as well." Id. at 1346 (citation omitted). "To prove the existence of a contract under Alabama law, the party seeking to enforce the contract must prove by a preponderance of the evidence: 'an offer[,] an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.'" Id. at 1345-1346 (citation omitted).[10] Also, under Alabama law, "[a]rbitration provisions are to be treated like any other contractual provision." Service Corp. Intern. v. Fulmer, 883 So. 2d 621, 633 n.15 (Ala. 2003).

In Burch, the Eleventh Circuit explained that when the existence of an arbitration agreement is at issue, the Court applies a "summary-judgment like standard[.]" Burch, 861 F. 3d at 1346 (citing Bazemore, 827 F. 3d at 1333). "If, under a 'summary judgment-like standard,' the district court concludes that there 'is no genuine dispute as to any material fact concerning the

---

this policy favoring arbitration, the "FAA creates a 'presumption of arbitrability' such that 'any doubts concerning the *scope* of arbitrable issues should be resolved in favor of arbitration.'" Bazemore, 827 F.3d at 1329 (emphasis in original).

[10] The parties have made their arguments pursuant to Alabama law. Thus, they do not dispute that Alabama law applies.

formation of such an agreement,' it 'may conclude as a matter of law that [the] parties did or did not enter into an arbitration agreement." <u>Burch</u>, 861 F. 3d at 1346 (citation omitted). "If, on the other hand, the making of the agreement is in issue, 'the court shall proceed summarily to the trial thereof.'" 9 U.S.C. § 4. "As in a traditional summary judgment motion, an examination of substantive law determines which facts are material." <u>Id</u>. (citation omitted).

As to contract formation, Rix states that she did not electronically receive, review, and sign the ADRP or any arbitration agreement (doc. 23, doc. 24-6). She also states that she did not have access to the HR Vault, but instead, documents were emailed to her personal email for signature. (Id.). Rix argues that if the Court decides that Northcutt has not waived its right to arbitrate, the authenticity of the signature on the ADRP should be decided by a jury (doc. 23, p. 11). Rix points to Section 4 of the FAA which provides for a jury trial on the issue of whether an arbitration agreement was made between the parties. 9 U.S.C. § 4.

Northcutt did not specifically reply to Rix's jury demand. However, Northcutt argues that there is no genuine issue of fact that Rix signed the ADRP as evidenced by the Signature Receipts and the circumstances surrounding the signature (doc. 25). (See Sections II(E)&(F) herein). Northcutt argues that Rix cannot create a genuine fact issue regarding making an arbitration agreement because her "affidavit proffers contradictory statements regarding her access to HR Vault and familiarity with signing documents electronically" and Alabama law does not require an "audit trail" for a valid signature. (Id., p. 5).

As to contradictory statements, Northcutt states that Rix declared she was "unaware of the ADRP" but "admits that she was emailed a copy" of the Core Policies, which specifically reference the ADRP. Northcutt points to Rix's supporting text messages wherein she states that she does not have access to the HR Vault and asks the Human Resources Director to email the

Core Policies to her (doc. 24-1) and to Rix's email receipt showing she received the Core Policies (doc. 24-2). Northcutt also argues that the text message exchange (doc. 24-1) illustrates that Rix was familiar with electronically signing documents because she asked if forms could be emailed to her for signature instead of coming to the office. (doc. 25, p. 6-7).

As to Rix's claim that she "never had access to the HR Vault" (doc. 25, p. 6), Northcutt states that Rix completed other documents using the system. Specifically, a Return from Furlough Acknowledgment post-Covid 19 when the business reopened (doc. 25-1).

Applying a "summary-judgment like standard", Burch, 861 F. 3d at 1346 (citation omitted), and viewing the evidence in the light most favorable to the non-movant Rix, the Court finds that there is a genuine dispute of fact as to whether Rix electronically received, reviewed, and signed the ADRP.   Rix provides her sworn declaration pursuant to 28 U.S.C. § 1746, and declares that on her "personal knowledge of the facts" as follows:

> 3. At no time during my employment with Northcutt Dental did I ever sign an arbitration agreement, electronically or otherwise.
>
> 4. I have never seen nor was I ever provided any arbitration agreement by anyone associated with Northcutt Dental.
>
> 5. I did not sign an agreement, electronically or otherwise, titled "Alternative Dispute Resolution Policy (ADRP)".
>
> 6. I did not click on anything on any electronic device agreeing to resolve any of my claims against Northcutt Dental using arbitration.
>
> 7. I have never seen nor was I ever provided a copy of Northcutt Dental's Alternative Dispute Resolution Policy.
>
> 8. I have never signed or reviewed any agreement related to arbitration or alternative dispute resolution produced by or provided by Northcutt Dental.

17

9. I also never had access to the "HR Vault Portal" referenced in the Declaration of Kathryn B. Hornung. …

10. I unequivocally dispute any assertion that I signed, agreed to, was aware of, received, and/or reviewed any document titled "Alternative Dispute Resolution Policy", or any document purporting to bind me to arbitration or alternative dispute resolution in connection with my employment with Northcutt Dental.

(Doc. 24-6).

However, Northcutt also argues that, even if Rix did not electronically receive and sign the ADRP, her continued employment manifests her assent to the ADRP. Northcutt points out the Core Policies, which reference the ADRP, were emailed to Rix in 2018 and again in February 2021, and she continued to work until May 2021.

In that regard, Rix declares that she never received "any document purporting to bind" her to arbitration. But in her effort to prove that she didn't have access to the HR Vault, she uses a text message wherein she asks the Human Resources Director to <u>email documents</u> to her (doc. 24-6). Human Resources emailed the Core Policies to Rix on February 9, 2021.[11]  The Core Policies reference the ADRP: "Please note that the Practice has also implemented the Alternative Dispute Resolution Policy (ADRP)." (Doc 20-1, p. 79). She continued to work until May 6, 2021. Rix has not denied receiving the Core Policies.

---

[11] In her declaration, Rix quotes the Human Resources Director's statement that the Core Policies, "is in your Vault that you have access to. If you cannot find it, **I will send it with everything else** as soon as I am able" (doc. 24-6, p. 3). Rix responds: "Okay I don't have access **send it as well** thank you…" (Id.) (*sic*) (emphasis added).   Afterward, documents were emailed to Rix. The Google Mail screenshot indicates that Rix received copies of three PDF attachments "FMLA-Certification of H", "NYL.pdf", and "Core Policies Leave of A…" (doc. 24-2). Rix was trying to take a leave of absence and was gathering information to do so.

Under Alabama law, Rix doesn't have to receive the ADRP. There are cases where another document put someone on notice of the arbitration agreement, and then the employee is bound by continued employment.   In Am. Bankers Ins. Co. of Fla. v. Tellis, 192 So. 3d 386 (Ala. 2015), the Court explained:

> Although the policyholders claim not to have received forms AJ9821EPC–0608 and N1961–0798 [the arbitration endorsements], they had some duty to investigate the contents of those forms because the declarations page indicated that the forms were part of the policy. See, e.g., *Alfa Life Ins. Co. v. Colza,* 159 So.3d 1240, 1249–50 (Ala.2014) (noting that insurance *391 policyholders have a duty to read the documents provided them and are charged with the knowledge such a reading would impute to them), and *McDougle v. Silvernell,* 738 So.2d 806, 808 (Ala.1999) (stating that a party to a contract that fails to inform himself or herself of extraneous facts or other documents incorporated into the contract is nevertheless "bound thereby" (quoting *Ben Cheeseman Realty Co. v. Thompson,* 216 Ala. 9, 12, 112 So. 151, 153 (1927))). We further note that this Court has also enforced arbitration provisions in insurance policies where the plaintiffs claimed *never* to have received the written provisions containing the provisions. See, e.g., *Ex parte Southern United Fire Ins. Co.,* 843 So.2d 151, 156 (Ala.2002) (enforcing an arbitration provision even though it was claimed that "[the plaintiff] did not receive a copy of either the policy or the arbitration rules referenced in the policy"), and *Philadelphia American Life Ins. Co. v. Bender,* 893 So.2d 1104, 1109 (Ala.2004) (enforcing an arbitration provision in an insurance policy even though the plaintiff "claims that he did not receive a copy of the policy").

Id. at 390–91. See also, Jeffries v. Wells Fargo & Co., No. 2:16-CV-01987-LSC, 2017 WL 3149513, at *3 (N.D. Ala. July 25, 2017) ("the [Consumer Account] Application clearly informed Plaintiffs that disputes with Wells Fargo would be resolved through arbitration. By establishing a banking relationship with Wells Fargo and thereafter using the accounts they opened for several months, Plaintiffs expressed their assent to the "dispute resolution program." See UBS PaineWebber, Inc. v. Brown, 880 So. 2d 411, 414 (Ala. 2003) ("[A] person who continues a business relationship after receiving notice of an arbitration provision in the contract

governing that relationship implicitly consents to arbitrate any dispute that falls within the scope of the agreement.").

Accordingly, because Rix was aware that Northcutt had Core Policies and continued to work, under Alabama law she cannot now claim that she is not bound by those policies.   Rix was charged with the responsibility to investigate the policies and determine whether she wished to continue her employment. Rix' failure to do so is not a defense to abiding by the policies, which include the ADRP. Thus, her continued employment was a form of assent to the ADRP with Northcutt.

B. Arbitrability of Rix's claims

The ADRP applies to the following:

> Claims covered by this policy include, but are not limited to, claims related to termination of employment; claims for wages or other compensation due; claims for breach of any contract or covenant, express or implied; tort claims; claims of harassment; claims for discrimination, including, but not limited to, discrimination based on race, gender, sexual orientation, religion, national origin, age, marital status, genetic information, handicap, disability or mental condition; wage and hour violation claims; claims for retaliation; claims for alleged violation of federal, state or other government constitution, statute, ordinance or regulation; and claims for benefits, except as excluded in the following section.

> By way of example only, such claims include claims under federal, state and local statutory or common law, such as Age Discrimination in Employment Act, Title VII of the Civil Rights Act or 1964, as amended, including the amendments of the Civil Rights Act of 1991, the Americans with Disabilities Amendments Act of 2008, the law of contract and the law of tort. Disputes arising out of a collective bargaining agreement between a union and an employer are only covered where the CBA indicates an agreement to be subject to arbitration.

 (Doc. 20-1, p. 12).

"Whether a claim falls within the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted." Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs., 553 F.3d 1351, 1366 (11th Cir. 2008) (citation

omitted). Rix's factual allegations indicate that her claims fail within the scope of the ADRP and the parties do not dispute that Rix's claims are within the scope of the ADRP. Thus, there are no doubts concerning the scope of arbitrable issues to resolve, and if there were, those doubts would be resolved in favor of arbitration. Mason v. Midland Funding LLC, 815 Fed. Appx. 320, 323 (11th Cir. 2020) ("The Federal Arbitration Act creates a 'presumption of arbitrability,' and under it, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'") (quoting Dasher v. RBC Bank (USA), 745 F.3d 1111, 1115 (11th Cir. 2014)).

C. Transaction involving interstate commerce

Northcutt argues that the ADRP is part of an employment contract which, although intrastate, affects interstate commerce (doc. 20, p. 11-12). Northcutt points out that its business substantially involves and affects interstate commerce because the daily operations include contracting with nationwide vendors, suppliers, and insurance providers. Rix does not dispute Northcutt's position (doc. 23).

The Court of Appeals for the Eleventh Circuit has found that "[a]rbitration agreements contained in employment contracts are generally enforceable." Hernandez v. Acosta Tractors, Inc., 898 F.3d 1301, 1304 (11th Cir. 2018) (citing Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119, 121 S.Ct. 1302, 1311, 149 L.Ed.2d 234 (2001)); Andrews v. Rain or Shine, Inc., No. 3:22-CV-403-BJD-LLL, 2022 WL 19914342, at *2 (M.D. Fla. June 27, 2022) (same). "[C]ompulsory arbitration agreements are now common in the workplace, and it is not an unlawful employment practice for an employer to require an employee to arbitrate, rather than litigate, rights under various federal statutes, including employment-discrimination statutes."

Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367 (11th Cir. 2005). Since the ADRP arose in the context of an employment relationship, the Court finds that the ADRP is governed by the FAA.

    IV. <u>Conclusion</u>

Upon consideration of the foregoing, the Court finds that Northcutt has not waived its right to move to compel arbitration. The Court also finds that the ADRP evidences a transaction involving commerce and is "satisfied that the issue[s] involved …[are] referable to arbitration under" the ADRP. 9 U.S.C. § 3. Moreover, Rix assented to the ADRP by her continued employment.   Accordingly, the motion to compel arbitration is GRANTED.


DONE and ORDERED this the 7th day of August 2023.


        <u>s/ Kristi K. DuBose</u>
        KRISTI K. DuBOSE
        UNITED STATES DISTRICT JUDGE